**Pursuant to Ind.Appellate Rule 65(D), this Memorandum Decision shall not be regarded as precedent or cited before any court except for the purpose of establishing the defense of res judicata, collateral estoppel, or the law of the case.**



FILED
Dec 17 2014, 10:17 am

CLERK
of the supreme court,
court of appeals and
tax court

ATTORNEY FOR APPELLANT:

**JOSEPH M. CLEARY**
Indianapolis, Indiana

ATTORNEYS FOR APPELLEE:

**GREGORY F. ZOELLER**
Attorney General of Indiana

**IAN McLEAN**
Deputy Attorney General
Indianapolis, Indiana

# IN THE
# COURT OF APPEALS OF INDIANA

| | |
|---|---|
| ROBERT WARNER, | ) |
| | ) |
| Appellant-Defendant, | ) |
| | ) |
| vs. | )   No. 29A05-1402-PC-52 |
| | ) |
| STATE OF INDIANA, | ) |
| | ) |
| Appellee-Plaintiff. | ) |

APPEAL FROM THE HAMILTON SUPERIOR COURT
The Honorable Steven R. Nation, Judge
Cause No. 29D01-1108-PC-12552 & 29D01-0508-PC-130

**December 17, 2014**

**MEMORANDUM DECISION – NOT FOR PUBLICATION**

**RILEY, Judge**

Appellant-Petitioner, Robert Warner (Warner), appeals the post-conviction court's denial of his petition for post-conviction relief.

We affirm.

## ISSUE

Warner raises one issue on appeal which we restate as: Whether Warner was denied effective assistance of counsel.

## FACTS AND PROCEDURAL HISTORY

We adopt this court's statement of facts as set forth in our memorandum opinion issued in Warner's direct appeal, *Warner v. State*, No. 29A04-0907-CR-420 (Ind. Ct. App. Dec. 11, 2009), *trans. denied*:

> On January 18, 2005, Warner spoke to M.N. on the telephone about a mutual friend. Warner told M.N. that he was sixteen years old and a high school sophomore. He was actually seventeen and a senior. Warner asked to meet M.N., and she agreed. She took her dogs for a walk in her neighborhood, and Warner met her. Warner told M.N. that she looked "innocent" and asked if she was a virgin. She told him that she was only thirteen and that she was a virgin. Warner asked her if she would be his girlfriend, and she agreed.
>
> On January 21, 2005, Warner and M.N. met at an ice-skating rink. M.N. believed that they were going to go to the mall and have dinner. Instead, after they got in Warner's car, he called his home and learned that his mother was out. Warner took M.N. to his house. He left her in the living room and went upstairs. Then he called M.N. She went upstairs and found him lying naked on the bed. M.N. "freaked out and went into the bathroom" and locked the door. Warner told her to come out, and that "it was going to be okay." M.N. unlocked the bathroom door and came out. Warner was still naked. He asked her if she "was ready." M.N. started crying and said "no." Warner said, "[E]ither you're ready or I'm going to make you be ready." Warner told M.N. to take her pants off and get on top of him, and she obeyed. When she "got on top of him, he pushed [her] down on him." She

2

was in pain and told him that it hurt. He told her to "shut up." Afterward, Warner took her back to the skating rink and told her "not to tell anyone or he was going to kill [her]."

Warner called M.N. the following day and asked to see her again. M.N. told him that she was scared of him. Warner apologized and said that "it would not happen again." M.N. agreed to see him. In the following months, Warner fondled M.N., put his penis in her mouth, and Warner and M.N. had sexual intercourse multiple times. M.N. was "scared to say no to him" because "he made [her] the first time."

Warner also had anal sex with M.N. twice. The first time, she told him she did not want to do it, but he disregarded her refusal and penetrated her anus, causing her to scream in pain and ask him to stop. He did not. As a result, M.N. suffered pain and discomfort for months. While at dinner with her parents for her fourteenth birthday, M.N. began crying due to the pain. She explained to her parents that she was in pain, but did not explain the cause. Her father gave her some medicinal cream for the pain.

On the second occasion, Warner was at M.N.'s house. They were watching television with M.N.'s father, and he fell asleep on the floor. Warner told M.N. that he wanted to have sex with her. She got on her knees on the couch and he pulled her pants off and penetrated her anus again. M.N. was in pain and wanted to scream out, but her head was pushed down in a pillow. Her father remained asleep.

In April 2005, M.N. and her family went to Florida on vacation. Warner gained entrance to M.N.'s home and took a pair of her underwear and a photograph of her from the home. That summer, Warner told M.N. to make "videos of [herself] in the bathtub fingering herself and he wanted [her] to moan a lot." M.N. did not want to make a video, but she did because she "didn't want him to get mad at [her]."

Slip op. at 1-2 (internal citations omitted). On August 2, 2005, the State filed an Information, charging Warner with two Counts of sexual misconduct, Class C felonies, and one Count of possession of child pornography, a Class D felony. On June 30, 2006, Warner waived juvenile court jurisdiction. Subsequently, on October 27, 2006, the State amended the Information by adding the following charges: eight Counts of child

molesting, Class B felonies, one Count of criminal deviate conduct, a Class B felony, one Count of sexual misconduct with a minor, a Class C felony, one Count of residential entry, a Class D felony, and one Count of conversion, a Class A misdemeanor.

A four-day jury trial was conducted from December 8 through December 11, 2008. At the close of the evidence, the jury found Warner guilty of child pornography, criminal deviate conduct, and conversion. Since the jury was hung on the remaining charges, the trial court declared a mistrial and set a jury trial for April 13, 2009. On March 26, 2009, the trial court sentenced Warner to one-and-one-half years for possession of child pornography, and ten years for criminal deviate conduct—with two years suspended, and eight years executed. Of the eight years, Warner was ordered to serve four years in the Indiana Department of Correction, four years in a Work Release Program, and two years on probation. Both sentences were to run concurrently. As for the conversion charge, the trial court ordered Warner to 365 days in the Hamilton County Jail.

On direct appeal, Warner only challenged the jury instructions tendered for his criminal deviate charge. Specifically, Warner argued that the trial court committed a fundamental error in instructing the jury that a child under the age of sixteen years could not consent to deviate sexual conduct or sexual intercourse. On December 11, 2009, we affirmed Warner's conviction. *See id*.

According to the Chronological Case Summary (CCS), on June 2, 2009, trial counsel Carolyn Rader (Attorney Rader) withdrew her appearance on representing Warner in the remaining charges, and thereafter, Warner hired his own counsel on June

4

29, 2009. Once again, the State amended the Information by renumbering the remaining Counts, dismissing one Count, and deleting the adjudicated Counts. On September 14, 2009, Warner filed a Notice of Alibi in relation to the remaining Counts and a Second Notice of Alibi on October 13, 2009. Following this court's affirmation of Warner's conviction in December 2009, the State moved to dismiss the remaining charges on January 22, 2010, stating:

> The State does not wish to retry the remaining counts given that (a) [Warner's] conviction has been upheld, (b) [Warner] has [not] petitioned for [] rehearing or transfer on the Court of Appeals' opinion, and (c) the State is satisfied with the sentence of the court.

(Appellant's App. p. 36). On February 2, 2010, the trial court granted the State's motion. Subsequently, Warner filed his post-conviction petition on August 8, 2011.

In his petition for post-conviction relief, Warner alleged that he was denied effective assistance of counsel because Attorney Rader had failed to: (1) investigate and present evidence that would have established that Warner did not have a computer or device capable of actually viewing the pornographic disk; (2) investigate and present an alibi which would have accounted for Warner's whereabouts during the times he was alleged to have engaged in criminal deviate conduct; (3) impeach M.N.'s testimony; and (4) investigate a letter written by M.N. allowing him to take M.N.'s underwear while her family was away on vacation and for that reason, he was not guilty of conversion. On September 12, 2013, the post-conviction court conducted Warner's evidentiary hearing. On January 8, 2014, the post-conviction court issued its Order denying Warner post-conviction relief.

5

Warner now appeals. Additional facts will be provided as necessary.

## DISCUSSION AND DECISION

It is well established that post-conviction proceedings do not afford the petitioner with a super appeal, but rather, provide the opportunity to raise issues that were unknown or unavailable at the time of the original trial or the direct appeal. *Turner v. State*, 974 N.E.2d 575, 581 (Ind. Ct. App. 2012), *trans. denied*. The proceedings do not substitute for a direct appeal and provide only a narrow remedy for subsequent collateral challenges to convictions. *Id*. If an issue was available on direct appeal but not litigated, it is waived. *Id*. A petitioner must establish his claims to post-conviction relief by a preponderance of the evidence. Ind. Post-Conviction Rule 1, § 5.

Appeal from a denial of post-conviction relief is equivalent to an appeal from a negative judgment. *Turner*, 974 N.E.2d at 581. We will therefore not reverse unless the evidence as a whole leads unerringly and unmistakably to a decision opposite that reached by the post-conviction court. *Id*. Where the post-conviction court has entered findings of fact and conclusions of law, we accept the findings of fact unless clearly erroneous, but accord no deference for conclusions of law. *Id*. We will disturb a post-conviction court's decision as being contrary to law only where the evidence is without conflict and leads to but one conclusion, and the post-conviction court has reached the opposite conclusion. *Id*. at 581-82. The post-conviction court is the sole judge of the weight of the evidence and the credibility of witnesses. *Id*.

Warner urges to find that Attorney Rader was ineffective for: (1) failing to present Warner's alibi which would have accounted for his whereabouts during the times he was

6

alleged to have engaged in criminal deviate conduct; (2) failing to call other witnesses to impeach M.N.; and (3) failing to investigate the existence of a letter written by M.N. allowing him to take M.N.'s underwear while her family was away on vacation.

## I. *Notice of Alibi*

Warner first argues that Attorney Rader was ineffective for failing to investigate and present an alibi which he believes would have vindicated him from criminal deviate conduct.[1] We strongly presume that counsel provided adequate assistance and exercised reasonable professional judgment in all significant decisions. *McCary v. State*, 761 N.E.2d 389, 392 (Ind. 2002). We assess counsel's conduct based upon the facts known at the time and not through hindsight. *See State v. Moore*, 678 N.E.2d 1258, 1261 (Ind. 1997). Lastly, we do not "second-guess" strategic decisions requiring reasonable professional judgment even if the strategy in hindsight did not serve the defendant's interests. *Id.*

In addition, in reviewing claims of ineffective assistance, we are mindful that the failure to present an alibi defense is not necessarily ineffective assistance of counsel. *D.D.K. v State*, 750 N.E.2d 885, 890 (Ind. Ct. App. 2001) (citing *Jones v State*, 569

---

[1] Warner also argues that the State was encouraged to dismiss the remaining charges after he filed his notice of alibi in his second case. Therefore, Warner argues that if Attorney Rader had pursued an alibi defense in relation to his criminal deviate charge, he would have been vindicated from the crime. We disagree, and give deference to footnote number 2 of the post-conviction court's finding stating:

"[Warner] may be arguing that the timing of the [n]otice [of] [a]libi and the Motion to Dismiss suggest that the State felt compelled to dismiss the remaining charges due to the [n]otice [a]libi. However, the timing of the [c]ourt of [a]ppeals decision also provides a reasonable basis for the State to dismiss the remaining charges, and in fact, that is the reason provided by the State in the [m]otion. Given that no evidence to the contrary was presented by [Warner], this argument must fail."

(Appellant's App. pp. 13-14).

N.E.2d 975, 982-83 (Ind. Ct. App. 1991)). Absent a strong showing to the contrary, we normally presume counsel failed to present an alibi defense because it was not indicated by the circumstances or, if indicated, was rejected upon due deliberation. *Lee v. State*, 694 N.E.2d 719, 721 n.7 (Ind. 1998).

Turning to the record, the Information charging Warner indicated that "on or about January 22, 2005 and June 17, 2005," Warner forced M.N. to submit to criminal deviate conduct by inserting his penis into M.N.'s anus. (Appellant's App. p. 62). At trial, M.N. testified that Warner had anal sex with her on at least two occasions. The first time, M.N. told Warner that she did not want to do it, but he disregarded her refusal and penetrated her, causing her to scream in pain. The second time, Warner was at M.N.'s house watching television with M.N.'s father, who fell asleep on the floor. While M.N.'s father was asleep, Warner told M.N. that he wanted to have sex with her. M.N. got on her knees on the couch, and Warner pulled her pants off and penetrated her anus again. M.N. was in pain and wanted to scream, but Warner pushed her head down into a pillow.

At his evidentiary hearing, Warner offered his Second Notice of Alibi Defense filed in relation to his second case. Warner presented it as evidence of what Attorney Rader should have offered at his first trial. The second alibi purported to account for Warner's whereabouts on the evening of January 21, 2005; his school, work, and dinner schedule from January 31, 2005, and February 4, 2005; and lastly, his school and work schedule between 7:00 a.m. to 5:00 p.m. from January 22, 2005 through February 28, 2007.

We initially note that the last part of Warner's Second Notice of Alibi only gives an account of his whereabouts between 7:00 a.m. to 5:00 p.m. from January 22, 2005, through February 28, 2007, and even with that account, it would still not exclude the possibility of him having anal sex with M.N. *after* 5:00 p.m. Moreover, we find that even without presenting an alibi defense at Warner's trial, the Second Notice of Alibi would have been merely cumulative. At trial, Attorney Rader elicited an alibi from Warner's mother who gave an explanation of Warner's work and school schedule. Specifically, Warner's mother stated that during the time he was accused of the sexual acts against M.N., Warner attended school in the morning, got off at 11:00 a.m., reported to work almost immediately, and would leave work at around 5:00 p.m. or 6:00 p.m.

Turning to counsel's performance, Attorney Rader averred that she had, in fact, considered offering an alibi defense on behalf of Warner, but ultimately chose not to pursue that defense. Warner's mother testified that she was surprised with trial counsel's omission. Attorney Rader explained that her change of trial plan was grounded in the fact that it would have been "difficult to present an alibi defense for each and every day over a period of [] 6 months" unless Warner kept an awfully detailed calendar. (P-C Tr. p. 18).[2] Also, taking into account that sex between teenagers happens quickly, she recalled that constructing an alibi would have been pointless because she "remembered thinking that teenagers . . . [did] things pretty fast" and that "every juror [] would remember that []." (P-C Tr. p. 19).

---

[2] Throughout this opinion, the transcript of Warner's trial will be cited as "Trial Tr." and the transcript of the post-conviction hearing will be cited as "P-C Tr."

All things considered, counsel believed that Warner's best chances lay with a tactic of presenting jury nullification, [3] and she focused her energies on developing the theory of a teenage romance in the minds of the jurors, and lessening the gravity of deviate sexual conduct to mere teenage sex. To effectuate her jury nullification defense, she carefully advised the jurors that they should not "disregard the law"; however, they should understand that is not "how real life works in teenage romance" and that they could find that Warner did not force M.N. submit to criminal deviate conduct. (P-C Tr. 13).

It is well established that this court will not speculate as to what may or may not have been an advantageous trial strategy. *Johnson v State*, 832 N.E.2d 985, 997 (Ind. Ct. App. 2005), *trans. denied*. Isolated mistakes, poor strategy, inexperience, and instances of bad judgment do not necessarily render representation ineffective. *Timberlake v. State*, 753 N.E.2d 591, 603 (Ind. 2001). At the time of the trial, Attorney Rader considered raising an alibi defense but decided against it for strategic reasons. Because we defer to counsel's strategic and tactical decisions, Warner has failed to show that trial counsel's performance fell below an objective standard of reasonableness. *See Reed v. State*, 866 N.E.2d 767, 769 (Ind. 2007).

## II. *Failure to Call Other Witnesses*

---

[3] Jury nullification is "[a] jury's knowing and deliberate rejection of the evidence or refusal to apply the law either because the jury wants to send a message about some social issue that is larger than the case itself or because the result dictated by law is contrary to the jury's sense of justice, morality, or fairness." *Black's Law Dictionary* 875 (8th ed. 2004).

Next, Warner argues there were other family members and friends who would have effectively impeached M.N. At trial, M.N. testified that the first time she had sex with Warner was at his home and that before they had sex, Warner took away her cell phone and "locked it in his dresser." (Trial Tr. p. 387). M.N. further testified that there was an alarm clock in Warner's bedroom, and a princess castle belonging to Warner's sister in the residence. Attorney Rader cross-examined M.N. about these items being in Warner's home, and later called Warner's mother, who effectively impeached M.N. by stating that none of these items were present in her home.

We recognize that under certain circumstances, failure to call a useful witness can constitute deficient performance. *See Brown v. State*, 691 N.E.2d 438, 447 (Ind. 1998). Attorney Rader stated at the evidentiary hearing that she did not attempt to marshal up a parade of witnesses to impeach M.N. because the inconsistencies in M.N.'s testimony were trivial. She further explained that a jury would understand that "mothers are usually the ones who clean, who shut drawers, who put things away" and would be most familiar with the contents, and setting of a home. (P-C Tr. p. 24). As stated in the foregoing, the decision to call a witness is a matter of trial strategy, as such, we will not second-guess Attorney Rader's election of calling a single witness to impeach M.N. Moreover, we fail to see how the introduction of additional impeachment evidence against M.N. would have resulted in a different outcome.

A. *M.N.'s Letter*

Lastly, Warner argues that Attorney Rader failed to investigate the existence of a letter written by M.N. that would have somehow established that he did not steal M.N.'s

11

underwear while her family was away on vacation. The record reveals Warner did not ascertain the existence of the letter at his trial, neither did Attorney Rader recall seeing the letter at Warner's evidentiary hearing. In finding that Attorney Rader's performance was effective on this claim, the post-conviction court concluded that

> A. [Warner] alleges that [M.N.] gave Warner a letter that would have established that [M.N.] gave Warner her panties. At [Warner's trial], [Warner] did not admit this letter. [Attorney] Rader was asked if she was aware of such a letter, and she said that she did not recall it. [Warner's mother] testified that she found a letter and gave it to Warner's first attorney[,] David Thomas. Presumably, this is the letter to which [][Warner] refers; however, there is no evidence as to its contents.

> B. [][Warner] could have called David Thomas to testify that he received this letter from [Warner's mother]. [] [Warner] [c]ould also have called [M.N.] and asked if she wrote that letter [] . . .

(Appellant's App. p. 47). Given that the contents of the letter are unknown, and absent any showing that Attorney Rader should have known about the existence of the letter, we agree with the post-conviction court that Warner's claim was too attenuated to support post-conviction relief. Based on the foregoing, we conclude that Warner has failed to establish clear error in the post-conviction court's determination that counsel performed effectively.

## CONCLUSION

Based on the foregoing, we conclude that the post-conviction court properly denied Warner's petition for post-conviction relief.

Affirmed.

MATHIAS, J. and CRONE, J. concur